1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| DONTE MARKELL STEARNES, | ) | 1:09-CV-00647-GSA |
| | ) | |
| | ) | |
| Plaintiff, | ) | ORDER REGARDING PLAINTIFF'S |
| | ) | SOCIAL SECURITY COMPLAINT |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## **BACKGROUND**

Plaintiff Donte Markell Stearnes ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for supplemental security income pursuant to Title XVI of the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Gary S. Austin, United States Magistrate Judge.[1]

//

//

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  *See* Docs. 10 & 11.

## FACTS AND PRIOR PROCEEDINGS[2]

Plaintiff filed his application on or about July 27, 2006, alleging disability beginning January 1, 2003.  AR 139-143.  His application was denied initially on January 19, 2007 (AR 67-75), and upon reconsideration on April 26, 2007.  AR 92-95.  Thereafter, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 96.  ALJ Christopher Larsen held a hearing on August 26, 2008 (AR 19-55) and issued an order denying benefits on October 17, 2008.  AR 6-17.  Plaintiff requested a review of the hearing (AR 18) and the Appeals Council denied review.  AR 1-3.

### Hearing Testimony

ALJ Larsen held a hearing on August 26, 2008, in Fresno, California.  Plaintiff appeared and testified.  He was represented by attorney Dennis Bromberg.  Vocational Expert ("VE") Thomas C. Dachelet also testified.  AR 19-55.

Plaintiff was born on July 11, 1968.  AR 25.  He is five feet, nine inches tall, weighs 178 pounds, and is left handed.  *Id*.  He completed the twelfth grade and has no special job training.  *Id*.  He lives at a boarding house, which is paid for by a Welfare Department voucher.  AR 42, 52.  He has no income, but does receive food stamps.  AR 52.  He has health insurance through the County Medical Services Program (CMSP).  AR 52-53.  He has a valid California driver's license which requires him to wear corrective lenses.  AR 44-45.

When asked about his last job, Plaintiff indicated he last worked from August 2001 to February 2002, as a janitor at a truck stop.  AR 26-27.  He mopped floors, changed doorknobs, took out the trash, and restocked cabinets.  AR 26.  He occasionally lifted approximately 45 pounds.  *Id*.  He stopped working there because he was fired.  AR 34.

Plaintiff has constant pain in the "inside ball and joint" of his right ankle everyday.  AR 28.  Walking more than one quarter to one half mile makes the pain worse, and his foot swells after about 20 minutes of walking.  AR 28-29.  He can walk about one quarter of a mile and stand for about 20 minutes before he has to sit down.  AR 29.  He can sit for about 45 minutes

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

before he has to stand up.  *Id*.  His feet swell when he sits.  *Id*.  Taking medication and soaking his feet alleviates the pain.  AR 31.

Plaintiff is taking Vicodin, Soma, and Naprosyn.  AR 31-32.  He takes Vicodin once per day if he is at home and three times per day if he is not at home.  AR 33.  He takes Soma twice per day.  AR 32.  He takes Naprosyn three time per day and it alleviates the swelling.  AR 31, 33-34.  Medication side effects include drowsiness, dizziness, nausea, stomach aches, and headaches.  *Id*.  Plaintiff stated that his pain and pain medications also affect his ability to focus and concentrate.  AR 42-43.  When reading a book or watching television, he can focus for about 30 minutes at one time.  AR 43.

When asked about his eyes, Plaintiff stated that he started having problems when he was working at the truck stop.  AR 34.  The first symptoms were cloudiness and blurriness.  *Id*.  He has been wearing glasses since 2003, which helps his vision.  AR 34, 43.  He started using steroid drops about three years ago to relieve pressure from glaucoma.  AR 35, 41.  He uses the drops three times per day.  AR 35.  Two times per week his eyes remain cloudy until about 3:00 or 4:00 in the afternoon.  *Id*.  When his eyes are cloudy, he can't read the newspaper.  AR 36.  On a day when his eyes are clear, he has some double vision and has to squint to see beyond six or seven feet.  AR 36-37.  When his eyes are cloudy, it affects his peripheral vision.  AR 37.  He sees black spots.  AR 37-38.  Plaintiff could perform a job requiring him to assemble gadgets but on days where he had cloudiness he would not be able to keep up with other workers.  AR 38.

Plaintiff also has cataracts.  AR 38-39.  His doctors recommend cataract surgery, but they cannot proceed until the pressure from the glaucoma is reduced.  AR 39.  The doctors stated that he has a 40 percent chance of seeing better after the surgery, and a 60 percent chance that his vision would be worse.  AR 39-41.

On days when his vision is cloudy, Plaintiff does chores around the house.  AR 41.  He washes dishes, feeds the dogs, takes out the trash, and does laundry.  *Id*.  He can do this for about two hours.  AR 42.  On days when his vision is clear, he does chores for about three to three and one half hours.  *Id*.  The most physically demanding chore that he does is laundry.  *Id*.

1    VE Dachelet testified that Plaintiff's previous work as a janitor was considered a medium

2    physical demand, unskilled.  AR 44.  He was then asked to consider a hypothetical worker of

3    Plaintiff's age, education, and work experience, who is capable of light physical exertion, can

4    never climb ladders, ropes, or scaffolds, can frequently climb ramps or stairs, can occasionally

5    walk over uneven terrain, and has visual acuity inadequate for detailed or close work.  AR 45-47.

6    The VE indicated that a person with these restrictions would be unable to work.  AR 47, 50.

7    VE Dachelet was asked to consider a second hypothetical worker, of Plaintiff's age,

8    education, and work experience, who has similar impairments to the first hypothetical worker,

9    except that visual acuity is consistent with the ability to work as a janitor.  AR 48.  He indicated

10   that such an individual could perform jobs that exist in the national economy, including a car

11   wash attendant, goodwill ambassador, and an inspector/tester/sorter/sampler.  There are 9,217,

12   2,230, and 8,000 jobs respectively in California.  AR 48-49.

13   VE Dachelet was asked to consider a third hypothetical worker, of Plaintiff's age,

14   education, and work experience, who can stand and walk a total of two hours or less, and sit a

15   total of two to four hours, in an eight hour day.  AR 50.  The VE indicated that such an individual

16   could not work in the national economy.  *Id*.

17   Finally, VE Dachelet was asked to consider a fourth hypothetical worker posed by

18   Plaintiff's counsel which referenced the second hypothetical worker, except that one to two times

19   per week due to eye conditions and medication used for the eye, this person would not be able to

20   do work requiring near or far acuity for three quarters of a work day.  AR 50-52.  The VE

21   indicated that these limitations would close the world of work normally found in the national

22   economy.  AR 52.

23   **Medical Record**

24   The entire medical record was reviewed by the Court.  Summaries of the reports and

25   treatment notes are provided below.

26

27

28

4

1    ***William H. Hawkins, D.O.***

2        On August 29, 2002, Plaintiff was seen by his primary medical care provider, osteopathic

3    physician William H. Hawkins, at Madera Medical Association, for complaints of difficulty

4    seeing.  AR 310.

5        On October 17, 2002, Plaintiff was seen by Dr. Hawkins for a follow up.  AR 305.

6    During this visit, Plaintiff stated that the eye drops "really help" him.  *Id*.  The doctor assessed

7    his vision as 20/140 without correction.  *Id*.  He was diagnosed with iridocyclitis and arthritis of

8    the right foot, ankle, and right wrist.  *Id*.

9        On December 9, 2002, Plaintiff was seen for complaints of right ankle and right wrist

10   pain.  AR 304.  Dr. Hawkins' notes indicate Plaintiff had been disabled for eight months, but he

11   hurt his ankle after working for two to three hours, taking care of animals.  *Id*.  Vicodin and

12   Naprosyn were prescribed.  *Id*.

13       On five visits between September 7, 2005 and December 13, 2006, Dr. Hawkins

14   indicated that Plaintiff's condition had improved.  AR 249-250, 254, 265, 268.

15       On May 2, 2007, Plaintiff was seen for a follow-up computed tomography (CT) scan.  AR

16   334.  He was also seen for complaints of pain in his right ankle and in the bottom of his foot

17   when walking for long periods of time.  *Id*.

18       On August 8, 2007, Plaintiff was seen for medication refills and follow-up regarding his

19   right ankle.  AR 333.  Dr. Hawkins noted chronic pain and a limp, which affected Plaintiff's right

20   hip.  He recommended an MRI.  *Id*.

21       On February 4, 2008, Plaintiff was seen for complaints of pain in his right hip, lower

22   back, and right foot.  AR 326.  Dr. Hawkins noted that Plaintiff shifted his weight when walking,

23   which caused hip imbalance.  *Id*.

24       On March 17, 2008, Plaintiff was seen for complaints of blurry vision.  AR 325.  He

25   stated that he was still using the eye drops, still seeing Dr. Kummerfeld, and still wanted surgery.

26   *Id*.

27

28

**Rodney C. Remington, M.D.**

On September 3, 2002, Plaintiff was examined by ophthalmologist Rodney C. Remington at Fogg, Maxwell & Lanier EyeCare Medical Group.  AR 183.  Dr. Remington diagnosed Plaintiff with chronic iritis and secondary cataracts in both eyes.  *Id*.  Eye drops were prescribed.  *Id*.

On June 7, 2004, Plaintiff was again examined by Dr. Remington.  AR 183.  The doctor indicated that Plaintiff's vision was 20/200 in both eyes and that eye pressures were increased.  *Id*.  The doctor diagnosed Plaintiff with secondary glaucoma from chronic iritis in the eyes, and cataracts in both eyes.  *Id*.  Treatment included topical steroid and glaucoma eye drops.  The doctor opined that Plaintiff may need cataract surgery to try to improve his vision.  *Id*.

**Kevin R. Kummerfeld, M.D.**

On January 2, 2003, Plaintiff was examined by ophthalmologist Dr. Kevin R. Kummerfeld, M.D. at the Eye Medical Center of Fresno.  AR 241-242.  Dr. Kummerfeld's examination revealed that Plaintiff's visual acuity without correction was 20/200 bilaterally and his left pupil was irregular with no afferent pupillary defect.  AR 241.  The slit-lamp examination was significant for bilateral pinguecula, bilateral nasal pterygia, bilateral significant posterior synechiae nearly 360 degrees in each eye, and bilateral cell-and-flare.  *Id*.  The doctor's diagnosis included bilateral nongranulomatous iritis with bilateral severe posterior synechiae, cystoid macular edema, bilateral cataracts, and bilateral pterygia.  *Id*.  Pred Forte 1 percent and atropine sulfate 1 percent eye drops were prescribed.  AR 242.

On May 7, 2004, Plaintiff was seen for complaints of blurry vision.  AR 240.

On April 11, 2005, Plaintiff was seen again for complaints of blurred and foggy vision.  AR 239.  Dr. Kummerfeld assessed Plaintiff's vision at 20/200 in both eyes.  *Id*.  He noted that Plaintiff had been given a prescription for glasses by Dr. Howell but Plaintiff had not gotten the prescription filled.  *Id*.

On April 18, 2005, Plaintiff was seen for complaints of itchy eyes and cracked eyelids.  AR 238.  His vision was assessed at 20/100 in both eyes.  *Id*.  Plaintiff was diagnosed with inflammatory vs. steroid induced glaucoma.  *Id*.

6

On April 19, 2005, Plaintiff was seen for a 24-hour follow-up.  AR 237.  He stated his eyes were still a little itchy and there were no new noticeable changes.  *Id.*  Dr. Kummerfeld noted that there was marked improvement in intra ocular pressure.  *Id.*

On May 9, 2005, Plaintiff was seen for a two week follow-up.  AR 236.  Plaintiff stated that his eyes felt good and that he was able to read words on television.  *Id.*  His vision was assessed at 20/80 and 20/100.  *Id.*  Intra ocular pressure was within normal limits.  *Id.*

On June 1, 2005, Plaintiff was seen for complaints of intra ocular pressure variation.  AR 233.  Dr. Kummerfeld noted that Plaintiff's visual acuity was improved with new distance glasses.  *Id.*  Plaintiff's vision with glasses was 20/30 in both eyes.  *Id.*  The doctor noted that Plaintiff's eye pressure had increased.  *Id.*

On June 22, 2005, Plaintiff was seen for a follow-up visit regarding his iritis.  AR 232.  Plaintiff stated that he felt his vision was okay with glasses.  *Id.*  Dr. Kummerfeld assessed his vision with glasses as 20/40 in both eyes.  *Id.*  Medications were prescribed for intra ocular pressure.  *Id.*

On July 26, 2005, Plaintiff was seen for complaints of burning skin around his eyes caused by his medication, Atropine.  AR 228.  His vision was assessed at 20/30 and 20/40 with glasses.  *Id.*  Intra ocular pressure was above normal limits.  *Id.*  Medications were prescribed. *Id.*

On September 13, 2005, Plaintiff stated that he felt his vision was "a little better if he squints." AR 227.  His vision was assessed at 20/30 in both eyes.  *Id.*  Intra ocular pressure was above normal limits.  *Id.*  Medications were prescribed.  *Id.*

On October 18, 2005, Plaintiff was seen for a follow-up visit regarding his iritis.  AR 226.  He complained that the Atropine had been irritating the skin around his eyes for two months.  *Id.*  His vision with glasses was assessed at 20/25 in both eyes.  *Id.*  Dr. Kummerfeld noted that Plaintiff's glaucoma had improved but intra ocular pressure was above normal limits.  *Id.*  Medications were prescribed.  *Id.*

On November 29, 2005,  Plaintiff was seen for a follow-up visit regarding his iritis.  AR 223.  He stated that he was able to see more clearly, but still had double vision.  *Id.*  His vision

1    with glasses was assessed at 20/25 and 20/30.  *Id*.  Intra ocular pressure was above normal limits.

2    *Id*.  Medications were prescribed.  *Id*.

3          On January 27, 2006, Plaintiff was seen for a follow-up visit regarding his iritis.  AR 221.

4    He stated that he had blurry vision for three days in December 2005 but was subsequently able to

5    see more clearly.  *Id*.  However, Plaintiff reported having double vision for the past two months.

6    *Id*.  His vision with glasses was assessed at 20/25 and 20/30.  *Id*.  Intra ocular pressure was above

7    normal limits.  *Id*.  Medications were prescribed.  *Id*.

8          On January 22, 2007, Plaintiff was seen for a "steroid responder" visit.  AR 220.  His

9    vision was assessed at 20/40 in each eye.  *Id*.  Intra ocular pressure was above normal limits.  *Id*.

10   Dr. Kummerfeld noted that Plaintiff's glaucoma was improved but the pressure was "not as low

11   as it needs to be."  *Id*.  He also noted that Plaintiff was not using the eye drops appropriately.  *Id*.

12   The doctor indicated that Plaintiff's chronic iritis was stable.  *Id*.  Medications were prescribed.

13   *Id*.

14         On February 12, 2007, Plaintiff was seen for another "steroid responder" visit.  AR 219.

15   His vision was assessed at 20/40 in each eye.  *Id*.  Intra ocular pressure was above normal limits,

16   but nevertheless the doctor noted continuous improvement in intra ocular pressure.  *Id*.  Dr.

17   Kummerfeld further noted that Plaintiff was still not using the eye drops as instructed.  *Id*.

18   Medications were prescribed.  *Id*.

19         On March 5, 2007, Plaintiff was seen for another "steroid responder" visit.  AR 218.  Dr.

20   Kummerfeld noted that Plaintiff's vision fluctuates gradually with gradual light sense.  *Id*.  He

21   also noted that Plaintiff's eyes were dry and letters seem dark.  *Id*.  Plaintiff's vision was assessed

22   at 20/40 and 20/70 with glasses.  *Id*.  Intra ocular pressure was improved.  *Id*.  Medications were

23   prescribed.  *Id*.

24         On May 14, 2007, Plaintiff was seen by Dr. Kummerfeld for another "steroid responder"

25   visit.  AR 319.  Dr. Kummerfeld indicated that Plaintiff's vision was blurry and assessed it as

26   20/70 and 20/60 with glasses.  *Id*.  The doctor noted that Plaintiff had not been utilizing his

27   medication.  *Id*.  Intra ocular pressure was "good."  *Id*.  Medications were prescribed.  *Id*.

28

1   On July 23, 2007, Plaintiff was seen for another "steroid responder" visit.  AR 318.  He

2   reported having a "milky film" in his eyes for the past several years.  *Id*.  His vision was assessed

3   at 20/70 in each eye with glasses.  *Id*.  Dr. Kummerfeld restarted him on Xalatan to reduce intra

4   ocular pressure.  *Id*.

5   On September 10, 2007, Plaintiff was seen for another "steroid responder" visit.  AR 317.

6   He reported that his vision was clear for a few days and then cloudy the next day.  *Id*.  His vision

7   was assessed at 20/80 in each eye with glasses.  *Id*.  Dr. Kummerfeld noted marked reduction in

8   intra ocular pressure.  *Id*.  Medications were prescribed.  *Id*.

9   On November 26, 2007, Plaintiff was seen for another "steroid responder" visit.  AR 316.

10  He reported that his visual acuity fluctuates with distance and near vision.  *Id*.  His vision was

11  assessed at 20/60 in each eye with glasses.  *Id*.  Dr. Kummerfeld noted that intra ocular pressure

12  was "excellent."  *Id*.

13  On March 4, 2008, Plaintiff was seen for another "steroid responder" visit.  AR 314.  He

14  reported that his eyes were drier than usual for the last three weeks and that he ran out of

15  medication.  *Id*.  Dr. Kummerfeld noted increased intra ocular pressure.  *Id*.  His vision was

16  assessed at 20/60 and 20/70 with glasses.  *Id*.  His visual field was "within normal limits."  *Id*.

17  Medications were prescribed.  *Id*.

18          ***Tahir Hassan, M.D.***

19  On April 10, 2006, internist Tahir Hassan, M.D., performed a comprehensive internal

20  medicine evaluation at the request of the Social Security Administration.  AR 184-186.

21  Plaintiff's chief complaints were glaucoma, right ankle pain, and hyperlipidemia.  AR 184.

22  Plaintiff's medications included Lopid, Vicodin, Naproxen, Cosopt eye drops, and Alphagan eye

23  drops.  *Id*.  A Snellen eye examination revealed vision of 20/30 with the right eye, 20/50 with the

24  left eye, and 20/30 with both eyes.  *Id*.  An examination of the right ankle revealed that planter

25  flexion was restricted to 20 degrees.  AR 186.  The examination was otherwise unremarkable.

26  AR 184-186.

27  Dr. Hassan's Medical Source Statement (MSS) indicated that Plaintiff can lift 25 pounds

28  frequently and 50 pounds occasionally.  AR 186.  Plaintiff can stand and walk for about six

hours, and sit for about six hours, in an eight hour work day with normal breaks.  *Id.*  He is
limited to occasional climbing, balancing, stooping, crawling, and crouching.  *Id.*  He does not
need an assisted device for walking and he has no manipulative, visual, communicative, or
environmental limitations.  *Id.*

### Rustom Damania, M.D.

On September 17, 2006, internist Rustom Damania, M.D., at MDSI Physician Services,
performed a comprehensive internal medicine evaluation.  AR 192-195.  Plaintiff's chief
complaints were chronic pain in the right ankle, chronic low back pain, and chronic headaches.
AR 192.  Plaintiff stated that he had not worked since 1997, and that a friend drove him to the
appointment.  *Id.*  A Snellen's test revealed vision of 20/200 without lenses in both eyes and
20/100 with lenses in both eyes.  AR 193.  Dr. Damania's diagnoses included glaucoma,
subconjunctival hemorrhage on the right eye of recent onset, and "right ankle problems" with
"chip fracture."  AR 194.

Plaintiff's coordination, station, and gait were normal, but he declined to walk on his
heels on the right side because of an "old fracture."  AR 193.  The examination revealed
decreased range of motion in extension and lateral flexion of the lumbar spine.  *Id.*  Range of
motion in the right ankle was diminished in dorsiflexion and plantar flexion, but there was no
swelling, deformity, or ankylosis.  *Id.*

Dr. Damania opined that Plaintiff could stand and walk six hours, and sit six hours, in an
eight hour day, with no assistive device.  AR 194.  He could lift 10 pounds frequently and 20
pounds occasionally.  *Id.*  There are no postural, manipulative, communicative, or workplace
environmental limitations.  AR 194-195.  The doctor stated that Plaintiff "does seem to have
some relevant visual impairment which should be followed up by an ophthalmological report,
though [Plaintiff] did not particularly have difficulty entering and leaving the office."  AR 194.

### Physical RFC Assessment

On October 5, 2006, state agency physician Richard Betcher, M.D., completed a Physical
Residual Functional Capacity (RFC) Assessment.  AR 196-200.  He opined that Plaintiff could
lift up to 25 pounds frequently and up to 50 pounds occasionally.  AR 197.  He could stand

and/or walk for a total of about six hours, and sit for a total of about six hours, in an eight-hour work day. *Id*. He could frequently climb ramps and stairs but could never balance. AR 198. There were no manipulative, visual, or communicative limitations. AR 198-199. He must avoid concentrated exposure to uneven terrain. AR 199. The doctor felt medium work was appropriate. AR 200. On April 26, 2007, state agency physician A. Jing, M.D., agreed with the RFC assigned by Dr. Betcher. AR 312-313.

### *Madera Community Hospital*

On April 11, 2007, a CT scan was performed on Plaintiff's right ankle. AR 335. No definite acute fracture or dislocation was found. *Id*. The scan did reveal soft tissue swelling along the medial and lateral malleolus. *Id*. All other findings were unremarkable. *Id*.

On November 15, 2007, an X-ray was performed on Plaintiff's right ankle. AR 329. No acute abnormality, fracture, or dislocation was found. *Id*. There was suggested evidence of a small old ossicle avulsed from the medial malleolus. *Id*.

### *Eunice E. Hall, FNP*

On July 3, 2008, Family Nurse Practitioner (FNP) Eunice E. Hall completed a Verification of Disability form. AR 336-339. Nurse Hall opined that Plaintiff was permanently unfit for gainful employment as a result of "hypertension, glaucoma and blindness, low back syndrome, [and right] ankle fracture [with] chronic pain." AR 336. She further opined that Plaintiff can stand or walk less than two hours at a time and less than two hours total in an eight hour day. AR 338. Plaintiff can sit less than two hours at a time and less than four hours total in an eight hour day. *Id*. His ankle pain restricts repetitive movements. *Id*. He is restricted by environmental factors, specifically heat and cold. *Id*. He cannot climb ladders or work at sustained heights. *Id*. He can lift 20 pounds occasionally. AR 339. He can occasionally climb, crawl, and reach, but can never balance, stoop, kneel, or crouch. *Id*. Side effects from his medications such as drowsiness and inability to concentrate, and frequent medical appointments affect his ability to work. *Id*.

**ALJ's Findings**

The ALJ found that Plaintiff has not engaged in substantial gainful activity since July 27, 2006, and has the severe impairments of chronic iritis with secondary glaucoma, bilateral cataracts, degenerative joint disease of the right ankle, and hypertension.  AR 11.  Nonetheless, the ALJ determined that the severe impairments do not meet or exceed one of the listed impairments.  AR 12.

Based on his review of the medical evidence, the ALJ determined that Plaintiff has the RFC to lift and carry 20 pounds occasionally and 10 pounds frequently.  AR 12.  Additionally, he can: (1) stand and walk for six hours in an eight-hour workday; (2) sit for six hours in an eight-hour workday; (3) climb ramps and stairs frequently; and (4) walk over uneven terrain occasionally.  *Id.*  However, Plaintiff should never climb ladders, ropes, or scaffolds.  Given these limitations, Plaintiff has sufficient visual acuity to work as a janitor, which is tantamount to a limitation to occasional near visual acuity.  *Id.*

When formulating the RFC, the ALJ determined that Plaintiff has no past relevant work, is a younger individual with at least a high school education, and is able to communicate in English.  AR 16.  Transferability of job skills was not an issue because Plaintiff had no past relevant work.  AR 16.  After considering the Plaintiff's age, education, work experience, and RFC, the ALJ determined there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.  AR 16.  Accordingly, the ALJ found that Plaintiff was not disabled, as defined in the Social Security Act.  AR 17.

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence.  42 U.S.C. § 405 (g).  Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at

401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

## **REVIEW**

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).  The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process.  20 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f).  Applying this process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since July 27, 2006; (2) has an impairment or a combination of impairments that is considered "severe" based on the requirements in the Regulations (20 CFR §§ 416.920(c)); (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) had no past relevant work; and (5) could perform jobs that exist in significant numbers in the national economy.  AR 11-16.

1    Here, Plaintiff argues that the ALJ failed to properly evaluate his visual and nonexertional

2    impairments and failed to properly assess Nurse Hall's medical source statement (MSS).

3                                              **DISCUSSION**

4    *A.*        ***Visual and Nonexertional Impairments***

5    *Credibility*

6          Plaintiff argues that the ALJ failed to properly evaluate his visual and nonexertional

7    impairments by rejecting his testimony about his fluctuating and "milky" vision and right ankle

8    impairment.  Defendant counters that the ALJ properly evaluated Plaintiff's visual and ankle

9    impairments.

10         A two step analysis applies at the administrative level when considering a claimant's

11   subjective symptom testimony.  *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). First, the

12   claimant must produce objective medical evidence of an impairment that could reasonably be

13   expected to produce some degree of the symptom or pain alleged.  *Id*. at 1281-1282.  If the

14   claimant satisfies the first step and there is no evidence of malingering, the ALJ may reject the

15   claimant's testimony regarding the severity of his symptoms only if he makes specific findings

16   that include clear and convincing reasons for doing so.  *Id*. at 1281.  The ALJ must "state which

17   testimony is not credible and what evidence suggests the complaints are not credible." *Mersman*

18   *v. Halter*, 161 F.Supp.2d 1078, 1086 (N.D. Cal. 2001), quotations & citations omitted ("The lack

19   of specific, clear, and convincing reasons why Plaintiff's testimony is not credible renders it

20   impossible for [the] Court to determine whether the ALJ's conclusion is supported by substantial

21   evidence"); Social Security Ruling ("SSR") 96-7p (ALJ's decision "must be sufficiently specific

22   to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave

23   to the individual's statements and reasons for that weight").

24         An ALJ can consider many factors when assessing the claimant's credibility.  *See Light v.*

25   *Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).  The ALJ can consider the claimant's

26   reputation for truthfulness, prior inconsistent statements concerning his symptoms, other

27   testimony by the claimant that appears less than candid, unexplained or inadequately explained

28   failure to seek treatment, failure to follow a prescribed course of treatment, claimant's daily

1  activities, claimant's work record, or the observations of treating and examining physicians.

2  *Smolen*, 80 F.3d at 1284; *Orn v. Astrue*, 495 F.3d 625, 638 (2007).

3      The first step in assessing Plaintiff's subjective complaints is to determine whether

4  Plaintiff's condition could reasonably be expected to produce the pain or other symptoms

5  alleged.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007).  Here, the ALJ found that

6  Plaintiff had the severe impairments of chronic iritis with secondary glaucoma, bilateral

7  cataracts, degenerative joint disease of the right ankle, and hypertension.  AR 11.  He further

8  found that

9      [Plaintiff's] medically-determinable impairments can reasonably be expected to produce
       his alleged symptoms, but his statements about the intensity, persistence, and limiting
10     effects of those symptoms are not credible to the extent they are inconsistent with my
       assessment of his residual functional capacity, for the reasons explained below."

11  AR 15.  This finding satisfied step one of the credibility analysis.  *Smolen*, 80 F.3d at 1281-1282.

12      Because the ALJ did not find that Plaintiff was malingering, he was required to provide

13  clear and convincing reasons for rejecting Plaintiff's testimony.  *Smolen*, 80 F.3d at 1283-1284;

14  *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996) (as amended).  When there is evidence of an

15  underlying medical impairment, the ALJ may not discredit the claimant's testimony regarding the

16  severity of his symptoms solely because they are unsupported by medical evidence.  *Bunnell v.*

17  *Sullivan*, 947 F.2d 341, 343 (9th Cir. 1991); SSR 96-7.  Moreover, it is not sufficient for the ALJ

18  to make general findings; he must state which testimony is not credible and what evidence in the

19  record leads to that conclusion.  *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *Bunnell*,

20  947 F.2d at 345-346.

21      In this case, the ALJ made several credibility findings.  He noted that:

22  [Plaintiff] told Dr. Damania that he had not worked since 1997, but his earnings records
    shows work in 2001 and 2002.  In December, 2002, [Plaintiff] told Dr. Hawkins he had
23  been disabled for eight months, but also said he was working taking care of animals, and
    that his ankle became painful after two or three hours of work. [Plaintiff] has a dismal
24  work record, which diminishes his credibility as he does not appear motivated to look for
    work.  For an individual alleging disability, there is very little record of treatment.  Dr.
25  Hawkins' records are nearly illegible progress notes largely devoid of objective findings,
    and entirely devoid of any functional assessment. [Plaintiff] was prescribed glasses, but
26  delayed in getting them.  Dr. Damania admitted [Plaintiff] has "some relevant visual
    impairment," but stated [Plaintiff] was able to come and go from the doctor's office
27  without any apparent difficulty seeing his way. [Plaintiff] testified he was fired from the
    janitor job, but in his disability forms he said he had stopped working because his ankle
28

15

hurt and he was unable to see.  In spite of his visual complaints, he has a valid California driver's license that expires in 2009, meaning he likely renewed it in 2004.  When I asked him when it expired, he pulled it out of his pocket and read the expiration date.  When [Plaintiff's counsel] had a question about one of his answers on a disability form, he showed [Plaintiff] the form, and [Plaintiff] read it.  For all these reasons, Dr. Damania's observations, the fact he holds a valid driver's license, his seven or eight months of employment as a janitor, and his apparent ability to read things at the hearing, I conclude his visual impairment is not so bad as to prevent him from working.

AR 16.  (Citations omitted).

The majority of these findings are supported by evidence in the record.  In 2002, Plaintiff contradicted himself, stating to Dr. Hawkins that he had been disabled for eight months but was working taking care of animals at the time.  AR 304.  Plaintiff argues that this may have been volunteer work, but whether or not he received compensation is irrelevant to his ability to work.  In 2006, Plaintiff stated to Dr. Damania that he had not worked since 1997.  AR 192.  This statement is contradicted by Plaintiff's work as a janitor in 2001 and 2002 (AR 26-27) and his work with animals in 2002.  AR 304.  Plaintiff argues that he may have made a misstatement, but this argument is unpersuasive.  Plaintiff further contradicted himself by stating on his disability report that he stopped working because he could not see and the swelling in his ankle became worse (AR 149) but testified that he was fired from his job as a janitor.  AR 34.  Plaintiff argues that the disability report indicates that he became unable to work on January 1, 2003, and thus his testimony is consistent with the record.  However, Plaintiff did not assert, either in his disability report or at the hearing, that he did any work other than his janitorial job.  Thus, his stated reasons for ceasing work are contradictory.

The ALJ found that Plaintiff's credibility is further diminished by Plaintiff's poor work record, his possession of a valid California driver's license, and the fact that he was prescribed eyeglasses but delayed getting them.  AR 15.  Plaintiff does not dispute these credibility findings.

The ALJ further found Plaintiff not credible because there was very little record of treatment and Dr. Hawkins' records had few objective findings and no functional assessment.  AR 15.  Plaintiff argues that he sought regular treatment for his impairments and this Court agrees.  However, Plaintiff also argues that Dr. Hawkins' findings were objective because had an MRI and an x-ray performed, revealing old fractures and swelling in Plaintiff's ankle.  But the

1    MRI performed on April 11, 2007, revealed only soft tissue swelling along the medial and lateral

2    malleolus.  AR 335.  There was no definite acute fracture or dislocation, and all bones appeared

3    intact.  *Id*.  Similarly, the x-ray performed on November 15, 2007 only "suggested evidence of

4    small old ossicle evulsed from the medial malleolus," but no acute abnormality, fracture, or

5    dislocation.  AR 329.

6        As a result, the ALJ appropriately rejected Dr. Hawkins' "disabled" finding. (AR 247-

7    249, 284, 295, 302, 304), because the objective evidence did not support severe ankle pain.  AR

8    14.  In addition, the ALJ pointed out that Dr. Hawkins' indicated no functional limitations

9    associated with Plaintiff's impairments, proffered no objective evidence or clinical findings to

10   support disability, and is not authorized to make a determination of disability.  AR 14.  Thus, this

11   reason is valid and supports a finding that Plaintiff's subjective statements about the intensity,

12   persistence, and limiting effects of his ankle impairment are not credible.

13       Plaintiff argues that Dr. Damania's observation that Plaintiff had no difficulty entering

14   and leaving the office (AR 194) does not support a finding of incredibility.  The Court agrees.

15   Plaintiff further argues that his ability to read his driver's license and a disability form at the

16   hearing also do not support a finding of incredibility.  The Court agrees.  Notwithstanding the

17   above, the Court finds that these errors were harmless because the ALJ gave other reasons for his

18   credibility determination which is supported by substantial evidence.  *Batson v. Barnhart*, 359

19   F.3d 1190, 1197 (9th Cir. 2004) (upholding ALJ's credibility determination even though one

20   reason may have been in error); *Carmickle v. Commissioner of Social Sec. Admin., 533 F. 3d* at

21   1162 (*citing Batson v. Comm. of Soc. Sec. Admin.*, 359 F. 3d 1190, 1197) ("So long as there

22   remains "substantial evidence supporting the ALJ's conclusions on ... credibility" and the error

23   "does not negate the validity of the ALJ's ultimate [credibility] conclusion" such is deemed

24   harmless and does not warrant reversal.")

25       It is not the role of the Court to redetermine Plaintiff's credibility *de novo*.  Although

26   evidence supporting an ALJ's conclusions might also permit an interpretation more favorable to

27   the claimant, if the ALJ's interpretation of evidence was rational, as here, the Court must uphold

28

1  the ALJ's decision where the evidence is susceptible to more than one rational interpretation.

2  *Burch v. Barnhart*, 400 F.3d 676, 680-81 (9th Cir. 2005).

3      **B.**    ***Medical Opinion Evidence and the ALJ's RFC Finding***

4      Plaintiff points out that the ALJ gave greater weight to the opinion of examining

5  physician Dr. Damania, and less weight to the opinions of examining physician Dr. Hassan and

6  state agency medical consultants.  However, Plaintiff fails to argue how this weighting was

7  prejudicial.  The ALJ gave less weight to Dr. Hassan's opinion because "he did not consider any

8  visual limitations."  AR 13.  The ALJ gave less weight to the opinion of the state agency medical

9  consultants because "[they do] not consider [Plaintiff's] visual impairment or his chronic ankle

10  pain."  AR 13.  This weighting favored Dr. Damania's finding of a light RFC over the finding of

11  a medium RFC by Dr. Hassan and the state agency medical consultants, which is certainly to

12  Plaintiff's advantage.

13      Plaintiff also argues that the ALJ erred in relying on the opinion of Dr. Damania because

14  Dr. Damania is not an ophthalmologist and recognized that Plaintiff's visual issues were outside

15  his area of expertise.  Plaintiff further argues that the ALJ has a duty to develop the record

16  because Dr. Damania recommended an ophthalmologic evaluation.

17      In general, it is the duty of the claimant to prove to the ALJ that he is disabled.  20 C.F.R.

18  § 404.1512(a).  To this end, he must bring to the ALJ's attention everything that supports a

19  disability determination, including medical or other evidence relating to the alleged impairment

20  and its effect on his ability to work.  *Id.*  For his part, the ALJ has the responsibility to develop "a

21  complete medical history" and to "make every reasonable effort to help [the plaintiff] get medical

22  reports."  20 C.F.R. § 404.1512(d).  If this information fails to provide a sufficient basis for

23  making a disability determination, or the evidence conflicts to the extent that the ALJ cannot

24  reach a conclusion, he may seek additional evidence from other sources.  20 C.F.R. §§

25  404.1512(e);  404.1527(c)(3), *see also Mayes v. Massanari*, 262 F.3d 963, 968 (9th Cir. 2001).

26      However, the ALJ's obligation to obtain additional evidence is triggered only "when the

27  evidence from the treating medical source is inadequate to make a determination as to the

28  claimant's disability."  *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002); *Tonapetyan v.*

18

1   *Halter*, 242 F.3d 1144, 1150 (9th Cir.2001) (holding that ALJs have a duty fully and fairly to

2   develop the record when the evidence is ambiguous or "the record is inadequate" to allow for

3   proper evaluation of the evidence).  When the ALJ finds support in the record adequate to make a

4   determination regarding the claimant's disability, he does not have a duty to contact the doctors."

5   *Bayliss, v. Barnhart*, 427 F. 3d 1211, 1217 (9th Cir. 2005).

6       Here, Plaintiff was already being treated by ophthalmologist Dr. Kummerfeld.  (AR 218-

7   242).  Therefore, a further ophthalmolic exam was not needed.  Dr. Kummerfeld's treatment

8   notes were adequate for the ALJ to make a proper determination of Plaintiff's visual impairment

9   so there was no need for the ALJ to obtain additional medical evidence.  AR 13.  In addition, the

10  ALJ noted that during Plaintiff's most recent ophthalmologic visit, on March 4, 2008, his visual

11  field was "within normal limits."  AR 314.

12      The ALJ further accounted for Plaintiff's visual impairment as follows:

13         I have provided for [Plaintiff's] visual impairment in the residual functional

14 capacity limiting him to occasional near acuity.  I arrived at this limitation by researching the occupational resources, and learned the work of a janitor requires only occasional near acuity.  Although [Plaintiff's] work as a janitor [is] not past relevant work because it did

15 not constitute substantial gainful activity, the fact remains he was able to perform the work in spite of his visual impairment.

16

17 AR 14.  Plaintiff discounts this provision by claiming that his vision precluded his ability to work

18 as a janitor, and cites to his testimony in the record.  However, Plaintiff did not testify that his

19 vision precluded his ability to work as a janitor.

20     Q    When did you start having the problems seriously with your eyes?
     A    That started right as I was working at the Pilot.  I'm not sure whatever chemical it
21           was that I was using to clean with but it started on that job.  But then soon after
          that when I got released, fired it got worse.
22

23 AR 34.  It seems clear from the testimony that Plaintiff's visual issues began when he was

24 working as a janitor, and got worse soon after he was "released" or "fired."  *Id*.  In addition, the

25 ALJ cited to Plaintiff's disability report, in which Plaintiff stated that he stopped working and

26 became unable to work due to problems seeing and ankle injury complications on January 1,

27 2003.  AR 15; *see also* AR 149.  This is well after Plaintiff's janitorial work ended in February

28

2002.  AR 27.  Plaintiff's contention that his visual problems precluded his ability to work as a janitor is without merit.

Notwithstanding the above, the ALJ placed a restriction on Plaintiff's RFC by limiting him to occasional near acuity.  AR 14.  "The ALJ must set out in the record his reasoning and the evidentiary support for his interpretation of the medical evidence." *Lester v. Chater*, 81 F.3d at 832.  "The ALJ must do more than offer his conclusions.  He must set forth his own interpretations and explain why they, rather than the doctors', are correct. *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988).  As Plaintiff notes, the ALJ is not allowed to use his own medical judgment in lieu of that of a medical expert. *Gonzalez Perez v. Secretary of Health & Human Serv.*, 812 F.2d 747, 749 (1st Cir. 1987); *Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir. 1992); *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005).  An ALJ may not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record. *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

Here, the ALJ did not use his own lay opinion as a substitution for medical evidence, but rather relied on the ophthalmological evaluations provided by Dr. Kummerfeld and imposed a visual limitation that was even more favorable to Plaintiff than indicated in the progress notes.  Therefore, the ALJ's RFC finding is supported by substantial evidence.

### C.    *Nurse Hall's Medical Source Statement*

Plaintiff argues that the ALJ failed to properly assess Nurse Hall's medical source statement.

Only physicians, psychologists, optometrists, podiatrists, and speech pathologists are classified as "acceptable medical sources."  20 C.F.R. § 416.913(a).  Nurse practitioners are classified as an "other" medical source.  20 C.F.R. § 416.913(d)(1).  The distinction between "acceptable medical sources" and "other" medical sources is necessary for three reasons:

> First, we need evidence from "acceptable medical sources" to establish the existence of a medically determinable impairment. *See* 20 C.F.R. 404.1513(a) and 416.913(a).  Second, only "acceptable medical sources" can give us medical opinions. *See* 404.1527(a)(2) and 416.927(a)(2).  Third, only "acceptable medical sources" can be considered treating

1    sources as defined in 20 C.F.R. 404.1502 and 416.902, whose medical opinions may be
     entitled to controlling weight. *See* 404.1527(d) and 416.927(d).

2    *Casey v. Astrue*, 2010 WL 1381658 (D.Ariz. March 31, 2010); Social Security Ruling (SSR) 06-

3    03p. An "adjudicator generally should explain the weight accorded opinions from 'other

4    sources' so that the discussion of the evidence in the determination or decision allows a claimant

5    or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an

6    effect on the outcome of the case." SSR 06-03p. A reviewing court may draw specific and

7    legitimate inferences from discussions of the evidence, particularly where conflicting evidence is

8    detailed and interpreted, and findings are made, in order to assess why a statement or opinion has

9    been rejected or accepted. *Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989); *Casey*, at

10   *7.

11   Here, the ALJ made the following finding regarding Nurse Hall's medical source

12   statement:

13
        The record also contains an opinion prepared by Eunice Hall, a nurse practitioner with Dr.
14      Hawkins' office. She completed a "Verification of Disability" dated July 3, 2008. She
        stated [Plaintiff] was permanently disabled because of hypertension, glaucoma and
15      blindness, low back syndrome, and right ankle fracture with chronic pain. I give little
        weight to this opinion because Ms. Hall is not an "acceptable medical source" under the
16      Regulations. She indicated severe limitations in standing, walking, sitting, lifting, and
        carrying, which she attributed to low back syndrome, right ankle pain, and chronic pain.
17      However, the objective medical evidence set forth above contains minimal findings
        regarding the right ankle and no objective indication of lumbar disc disease. Ms. Hall
18      also stated [Plaintiff] was blind, which is contrary to the medical evidence and diminishes
        the reliability of the opinion.
19

20   AR 14. (Citations omitted). The ALJ correctly points out that Nurse Hall is not an "acceptable

21   medical source." 20 C.F.R. § 416.913(a).

22   The ALJ also points out that the nurse's opinion is not supported by medical evidence in

23   the record with regard to Plaintiff's right ankle, lumbar disc disease, and blindness. AR 14. As

24   discussed above, the MRIs and x-rays that Dr. Hawkins relied on to establish his finding of

25   "disability" showed no real impairment in Plaintiff's ankle. AR 329, 335. As a result, the ALJ

26   properly rejected Dr. Hawkins' opinion. In addition, Plaintiff was only seen on one occasion by

27   Dr. Hawkins and Nurse Hall for complaints of low back pain. AR 326. No findings were made

28   and no tests were ordered. *Id*. In fact, the medical record is completely devoid of any objective

1  evidence of lumbar disc disease.  Thus, Nurse Hall's medical source statement appears to be

2  merely a recitation of Plaintiff's subjective complaints which the ALJ concluded were not

3  credible.

4        Moreover, Ms. Hall's finding of "blindness" is extreme.  Neither Dr. Hawkins nor Nurse

5  Hall is an ophthalmologist, and the weight of the ophthalmological evidence indicates that

6  Plaintiff's visual impairment is mitigated through steroid eye drops and corrective lenses when

7  taken as prescribed.  Because Nurse Hall assisted Dr. Hawkins in treating Plaintiff and performed

8  no independent objective medial examination of her own, it follows that her opinion is based on

9  the same medical evidence, or lack thereof, as Dr. Hawkins', and should be similarly discredited.

10  These are sufficient reasons to accord limited weight to her opinion.

11        Finally, Plaintiff's argument that Nurse Hall's opinion should be elevated to that of a

12  treating source because she was a member of Dr. Hawkins' "team" is unpersuasive.  Plaintiff

13  cites *Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1036 (9th Cir. 2003) in support of his

14  contention.  However, *Benton* is clearly distinguishable.  In *Benton*, the RFC was completed by

15  the *supervising physician* and the issue revolved around whether or not he could be considered a

16  treating source when his staff handled most of the contact with the Plaintiff and he had only seen

17  the Plaintiff on one occasion.  *Benton*, at 1034.  The court held that a psychiatrist who is

18  responsible for prescribing and monitoring medication, but leaves most of the direct patient

19  contact to others within a treatment team, is allowed to be a "treating source" either on his own

20  behalf or on that of the treatment team.  *Benton*, at 1041.  Benton is not instructive because Nurse

21  Hall, even if considered a member of a treatment "team," is not the supervising physician of that

22  team.  In addition, there is no evidence in the record that her opinion was reviewed or approved

23  by Plaintiff's treating physician, Dr. Hawkins.  Although she did periodically treat Plaintiff

24  within her capacity as a nurse practitioner, only "acceptable medical sources" can give medical

25  opinions or be considered treating sources.  20 C.F.R. § § 404.1527(a)(2), 416.927(a)(2),

26  404.1502, and 416.902.

27        In sum, the ALJ's decision to accord little weight to Nurse Hall's opinion is supported by

28  substantial evidence in the record and is free of legal error.

1    *C.      Medication Side Effects*

2          Plaintiff argues that his vision fluctuates and is milky due to his eye medications.  There

3    are two different approaches in the Ninth Circuit regarding an ALJ's duty to consider medication

4    side effects.  The first approach requires that an ALJ consider all factors that might have a

5    significant impact on an individual's ability to work, including the side effects of medications.

6    *Erickson v. Shalala*, 9 F.3d 813, 817-18 (9th Cir. 1993) (citing *Varney v. Secretary of HHS*, 846

7    F.2d 581, 585 (9th Cir. 1987) (superseded by statute on other grounds).  Under Varney, an ALJ

8    may not reject a claimant's testimony as to subjective limitations of side effects without making

9    specific findings similar to those required for excess pain testimony.  *Varney*, 846 F.2d at 585.

10         The second line of cases has distinguished Varney and has held that in order for an ALJ's

11   failure to discuss medication side effects to be in error, the side effects must be a contributing

12   factor in a claimant's inability to work.  *See*, *Osenbrock v. Apfel*, 240 F.3d 1157, 1164 (9th Cir.

13   2001), (no error in a question to a vocational expert that did not include information about side

14   effects because "[t]here were passing mentions of the side effects of Mr. Osenbrock's medication

15   in some of the medical records, but there was no evidence of side effects severe enough to

16   interfere with Osenbrock's ability to work."); *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir.

17   2005), (failure to expressly address medication side effects is not error where there was no record

18   support for side effects); *Miller v. Heckler*, 770 F.2d 845, 849 (9th Cir. 1985) (claimant had the

19   burden of producing evidence that his use of prescription narcotics impaired his ability to work).

20         Here, Plaintiff testified that the steroid eye drops he uses to treat his glaucoma contribute

21   to cloudiness in his vision.  AR 35.  However, he also testified that his vision "would be blurry

22   even without the drops" (AR 41) and that the drops are supposed to control the cloudiness.  AR

23   38.  The medical evidence indicates that Plaintiff's vision improved after taking medication and

24   obtaining eyeglasses.  In 2003 and 2005, Plaintiff's uncorrected vision was 20/200.  AR 239,

25   242.  He complained of blurry vision in May 2004 and April 2005.  AR 239-240.  Subsequently,

26   in 2005, Plaintiff's vision ranged from 20/100 to 20/80.  AR 236, 238.  After obtaining

27   eyeglasses in June, 2005, his corrected vision was 20/30.  AR 233.  Subsequently, in 2005,

28   Plaintiff stated to Dr. Kummerfeld that "his eyes felt good, he was able to read words on

1   television" (AR 236), and he "felt his vision was okay with glasses." AR 232. There were no

2   reports of blurry vision between January, 2006, and May, 2007. AR 218-242. In May, 2007, Dr.

3   Kummerfeld noted that Plaintiff's vision was blurry but also that Plaintiff had not been utilizing

4   his medications. AR 319. Plaintiff testified at the hearing that the glasses help his vision, both

5   close up and far away. AR 34-35. Thus, although Plaintiff may experience medication side

6   effects, it is evident they can be treated effectively by wearing eyeglasses and taking medication

7   regularly. The medical evidence and Plaintiff's testimony do not indicate that the side effects of

8   Plaintiff's medications limit his ability to work as a janitor when the medications are taken

9   regularly. Moreover, although Plaintiff references side effects in his testimony, Plaintiff filled

10  out three disability reports wherein he failed to list side effects of any medications that he was

11  taking for his eyes. AR 152, 162, 175. He also indicated on one disability report that his "cloudy

12  vision, blurry vision, pain [and] double vision" is "due to pressure [and] glaucoma." AR 160.

13  Given the record, the ALJ did not err in specifically addressing the medication side effects in the

14  opinion.

15                                         **CONCLUSION**

16          Based on the foregoing, the Court finds that the ALJ's decision is supported by

17  substantial evidence in the record as a whole and is based on proper legal standards.

18  Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the

19  Commissioner of Social Security. The Clerk of this Court is DIRECTED to enter judgment in

20  favor of Defendant Michael J. Astrue, Commissioner of Social Security, and against Plaintiff

21  Donte Markell Stearnes.

22          IT IS SO ORDERED.

23      **Dated:    July 28, 2010**                   **/s/ Gary S. Austin**
24                                           UNITED STATES MAGISTRATE JUDGE

25

26

27

28

24